UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TAMMY B.,[1] | ) |
| *Plaintiff*, | ) |
| v. | ) No. 1:21-cv-00611-JMS-DML |
| KILOLO KIJAKAZI, Acting Commissioner of the Social Security Administration, | ) |
| *Defendant*. | ) |

## ENTRY REVIEWING THE COMMISSIONER'S DECISION

In May of 2017, Plaintiff Tammy B. filed for supplemental security income ("SSI") and for disability insurance benefits ("DIB") from the Social Security Administration ("SSA"), alleging an onset date of April 10, 2012. [Filing No. 21-5 at 2; Filing No. 21-5 at 9.] Her applications were denied initially on September 26, 2017, [Filing No. 21-3 at 2; Filing No. 21-3 at 13], and upon reconsideration on March 22, 2018, [Filing No. 21-3 at 25; Filing No. 21-3 at 37]. Administrative Law Judge Albert J. Velasquez ("the ALJ") conducted a hearing on August 26, 2019, [Filing No. 21-2 at 82-123], and a second hearing on September 22, 2020, [Filing No. 21-2 at 44-81], before issuing a decision on October 19, 2020, concluding that Tammy B. was not entitled to benefits, [Filing No. 21-2 at 11-20]. The Appeals Council denied review on January 8, 2021. [Filing No. 21-2 at 2-7.] Tammy B. timely filed this civil action asking the Court to review the denial of benefits according to 42 U.S.C. § 405(g). [Filing No. 1.]

---

[1] To protect the privacy interests of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

# I.
## STANDARD OF REVIEW

"The Social Security Act authorizes payment of disability insurance benefits . . . to individuals with disabilities." *Barnhart v. Walton*, 535 U.S. 212, 214 (2002). "The statutory definition of 'disability' has two parts. First, it requires a certain kind of inability, namely, an inability to engage in any substantial gainful activity. Second, it requires an impairment, namely, a physical or mental impairment, which provides reason for the inability. The statute adds that the impairment must be one that has lasted or can be expected to last . . . not less than 12 months." *Id.* at 217.

When an applicant appeals an adverse benefits decision, this Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence supports the ALJ's decision. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citation omitted). For the purpose of judicial review, "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted).

The ALJ must apply the five-step inquiry set forth in 20 C.F.R. § 404.1520(a)(4)(i)-(v), evaluating the following, in sequence:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner]; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (citations omitted) (alterations in original).[2]

"If a claimant satisfies steps one, two, and three, she will automatically be found disabled. If a

---

[2] The Code of Federal Regulations contains separate sections relating to DIB and SSI that are identical in most respects relevant to this case. For the sake of simplicity, this Entry generally contains citations to DIB sections only.

claimant satisfies steps one and two, but not three, then she must satisfy step four. Once step four is satisfied, the burden shifts to the [Commissioner] to establish that the claimant is capable of performing work in the national economy." *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

After Step Three, but before Step Four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). The ALJ uses the RFC at Step Four to determine whether the claimant can perform her own past relevant work and if not, at Step Five to determine whether the claimant can perform other work. *See* 20 C.F.R. § 404.1520(iv), (v). The burden of proof is on the claimant for Steps One through Four; only at Step Five does the burden shift to the Commissioner. *See Clifford*, 227 F.3d at 868.

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits. *Barnett*, 381 F.3d at 668. When an ALJ's decision is not supported by substantial evidence, a remand for further proceedings is typically the appropriate remedy. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005). However, courts have the statutory power to affirm, reverse, or modify the SSA's decision, with or without remanding the case for further proceedings, and this power includes the ability to remand the case with instructions for the Commissioner to calculate and award benefits to the applicant. *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing 42 U.S.C. § 405(g)). "An award of benefits is appropriate, however, only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Id.*

## II.
### BACKGROUND

Tammy B. was 37 years of age on her alleged onset date.[3] [Filing No. 21-2 at 19.] Tammy B. has a high school education and previously worked as a school bus driver, deli clerk, fed-ex courier, housekeeping cleaner, and cafeteria worker.[4] [Filing No. 21-2 at 19.]

The ALJ followed the five-step sequential evaluation set forth by the SSA in 20 C.F.R. § 404.1520(a)(4) and ultimately concluded that Tammy B. was not disabled. [Filing No. 21-2 at 11-20.] Specifically, the ALJ found as follows:

- At Step One, she had not engaged in substantial gainful activity[5] since April 10, 2012, the alleged onset date. [Filing No. 21-2 at 13.]

- At Step Two, Tammy B. had three severe impairments: "osteoarthritis, orthostatic hypotension, and benign tremors." [Filing No. 21-2 at 13-15.] The ALJ also determined that Tammy B. has non-severe impairments consisting of narcolepsy without cataplexy, premature ventricular contraction, urinary incontinence, obesity, plantar fasciitis, anxiety, depression, and obsessive compulsive disorder, which "either alone or in combination with any other impairments, have not given rise to functional limitations imposing more than a mild limitation on [her] ability to perform basic work activities." [Filing No. 21-2 at 14.]

- At Step Three, she did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. [Filing No. 21-2 at 15-16.]

- After Step Three but before Step Four, Tammy B. had the RFC to perform "light work as defined in 20 CFR 404.1567(b) and 416.967(b) except lift and carry twenty pounds occasionally and ten pounds frequently, stand and walk for six of eight hours, sit for six of eight hours, no more than occasional climbing of

---

[3] The ALJ determined that Tammy B. meets the insured status requirements of the Social Security Act through December 31, 2017. [Filing No. 21-2 at 13.]

[4] The relevant evidence of record is amply set forth in the parties' briefs and need not be repeated here. Specific facts relevant to the Court's disposition of this case are discussed below.

[5] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized). 20 C.F.R. § 404.1572(a).

- stairs or ramps, no climbing of ladders or scaffolding, no more than occasional balancing, stooping, kneeling, crouching, or crawling; and no more than frequent fingering and feeling." [Filing No. 21-2 at 16-19.]

- At Step Four, Tammy B. was not capable of performing her past relevant work as actually or generally performed. [Filing No. 21-2 at 19.]

- At Step Five, relying on the testimony of the vocational expert ("VE") and considering Tammy B.'s age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Tammy B. can perform, including school bus monitor, counter clerk, and protective clothing issuer. Filing No. 21-2 at 19-20.]

## III.
### DISCUSSION

Tammy B.'s arguments center around the alleged limiting effects of her narcolepsy without cataplexy. [Filing No. 23 at 8-13.] Narcolepsy is a "chronic neurological disorder characterized by recurrent periods of an irresistible urge to sleep." *Evaluation of Narcolepsy*, Program Operations Manual System, Social Security, http://policy.ssa.gov/poms.nsf/lnx/0424580005 (Sept. 26, 2016) ("POMS DI 24580.005"). The SSA has observed that narcolepsy-related sleep symptoms will "range from mild drowsiness to severe sleepiness in which the individuals spend the entire day drifting in and out of sleep" and that "sleep periods" may range from "a few seconds to 30 minutes." POMS DI 24580.005.

Specifically, Tammy B. argues that the ALJ erred by: (1) failing to account for all of her narcolepsy-related limitations, including "falling asleep, being hyper-somnolent and wandering off task, or requiring naps during the workday," [Filing No. 23 at 11], and (2) "dismissing" the opinions of her treating provider, Dr. Cushing, regarding her narcolepsy-related limitations, [Filing No. 23 at 13]. Because the Court has determined that the first issue requires remand, it will begin with discussing that issue.

5

### A. Tammy B.'s Narcolepsy-Related Limitations in the RFC

Tammy B. argues that the RFC did not account for "any narcolepsy-related limitations whatsoever." [Filing No. 23 at 9.] Tammy B. further argues that the ALJ failed to address the evidence that supports her allegations, including her abnormal sleep latency testing, her Epworth Sleepiness Scale score, or Dr. Cushing's observation that she requires "multiple strategic naps throughout the day just to maintain a baseline of functionality and still often fell asleep unintentionally despite them." [Filing No. 23 at 10-13.]

The Commissioner responds that the ALJ found that "the clinical and objective evidence" did not support the severity and frequency of Tammy B.'s alleged symptoms.[6] [Filing No. 25 at 14.] The Commission further argues that the ALJ concluded that Tammy B.'s subjective statements were inconsistent with her medical records because her medical records "depict intermittent medication management." [Filing No. 25 at 16.]

In reply, Tammy B. argues that changes in medication use resulted from adverse side effects or because the medications did not provide relief for her symptoms, which was explicitly stated in Dr. Cushing's notes. [Filing No. 28 at 3.] Tammy B. argues that the Commissioner's contention that the ALJ's failure to mention Dr. Cushing's notes was an "indication [that she] did not . . . have the symptoms she alleged is both a post-hoc rationalization of the ALJ's failure . . . and not logical in light of Dr. Cushing's explanation for any [hyper-somnolence medication] non-compliance." [Filing No. 28 at 3.]

---

[6] The Commissioner argues in her response that Tammy B. claims that her "narcolepsy should have been found severe at Step Two." [Filing No. 25 at 11.] The Court notes that, while Tammy B. asserts that "the ALJ's conclusion [that her] narcolepsy was not a 'severe' impairment is demonstrably and obviously contradicted by any reasonable review of the record," Tammy B. does not further develop this argument and instead focuses on the ALJ's failure to include any narcolepsy-related limitations in the RFC. [Filing No. 23 at 9.] Accordingly, the Court will not address this argument.

The Seventh Circuit has observed that "an ALJ is not required to provide a complete and written evaluation of every piece of testimony and evidence, but 'must build a logical bridge from the evidence to his conclusion.'" *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015) (quoting *Schmidt v. Barnhart,* 395 F.3d 737, 744 (7th Cir. 2005)). Further, the ALJ "may not select and discuss only that evidence that favors his ultimate conclusion," *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995), but "must confront the evidence that does not support his conclusion and explain why it was rejected," *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Ultimately, the ALJ must "sufficiently articulate his assessment of the evidence to assure" the Court that he "considered the important evidence" and to enable the court "to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985) (internal quotation marks omitted)).

The Court finds that the ALJ failed to build an accurate and logical bridge from the evidence to his conclusion. While the ALJ determined that Tammy B. had the capacity to perform light work, the ALJ failed to address evidence that directly contradicts his conclusion. Specifically, the ALJ failed to address the numerous references in the record to Tammy B.'s need to take strategic naps throughout the day and her experiences with "sleep attacks." [Filing No. 21-8 at 228-229; Filing No. 21-8 at 282.] Additionally, the record indicates instances of Tammy B. falling asleep while using a computer and concerns regarding her falling asleep behind the wheel of a vehicle. [Filing No. 21-8 at 36; Filing No. 21-8 at 206; Filing No. 21-8 at 209; Filing No. 21-9 at 96.]

The ALJ also failed to address that Tammy B. scored a 20 out of 24 on the Epworth Sleepiness Scale, which measures the likelihood of dozing off or falling asleep while engaged in different activities. [Filing No. 21-8 at 282; *Dierking v. Berryhill*, 2018 WL 3863531, at *2 (C.D.

Ill. July 23, 2018).] "A score of 0-5 indicates normal daytime sleepiness; a score from 6-10 indicates higher normal daytime sleepiness; a score of 11-12 indicates mild excessive daytime sleepiness; a score of 13-15 indicates moderate excessive daytime sleepiness; and a score of 16-24 indicates severe excessive daytime sleepiness." *Dierking*, 2018 WL 3863531, at *2. Accordingly, Tammy B.'s score of 20 and 24 indicates that she suffers severe excessive daytime sleepiness. *Id.*

The above evidence is notable in light of the VE's testimony that in order to sustain light work, Tammy B. would be unable to "miss any time" during the probationary employment period and that Tammy B. would be unable to maintain full-time employment if she was off-task 20% of the day or more. [Filing No. 21-2 at 80.] It is unclear to the Court if the ALJ considered such evidence in determining that Tammy B. could sustain light work due to the ALJ's failure to meaningfully discuss Tammy B.'s narcolepsy-related limitations. [*See* Filing No. 21-1 at 16-19.]

The ALJ also failed to consider medical records explaining why Tammy B. has been unable to successfully treat her narcolepsy with certain medications when dismissing the limiting effects of Tammy B.'s narcolepsy. [Filing No. 21-2 at 17.] However, the record explicitly provides explanations for Tammy B.'s "on and off" medication use. [Filing No. 21-8 at 221 ("She is breast feeding, and is able to take only Wellbutrin."); Filing No. 21-8 at 228 ("she tried nuvigil but developed chest pain; she tried methylphenidate IR and ER, dextroamphetamine without relief or with side effects"); Filing No. 21-8 at 281 (noting that Tammy B. is "intolerant of nuvigil s/t chest pain, no benefit from modafinil, intolerant of methylphenidate, dextroamphetamine, adderall"); Filing No. 21-8 at 657 ("recent spells of unclear etiology, possible medication related seizures, medication has been discontinued); Filing No. 21-8 at 658 ("trial of Adderall discontinuation for a week, let us know how it's going in terms of palpitations etc.").] The Court notes that the SSA

8

has observed that when determining the severity of narcolepsy, "it is important to obtain from an ongoing treatment source a description of the medications used and the response to the medication." POMS DI 24580.005. Here, the record provided such information, but the ALJ apparently failed to consider it.

An ALJ has "the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue,* 596 F.3d 419, 425 (7th Cir. 2010). In the present case, the ALJ failed to consider in any way the limiting effects of Tammy B.'s narcolepsy. As a result, the ALJ failed to build an accurate and logical bridge and, accordingly, remand is necessary.

**B.   The ALJ's Consideration of Dr. Cushing's Opinions**

Tammy B. argues that the ALJ erred by dismissing the opinions of Dr. Cushing, which "indicated [that Tammy B.'s] narcolepsy and hyper-somnia would prevent her from maintaining the stamina and attention to maintain full-time work for eight-hours per day, five days per week." [Filing No. 23 at 14.] Tammy B. further argues that the ALJ referred to "normal physical examinations" and "mild objective findings" to dismiss Dr. Cushing's opinions, but the evidence that the ALJ cites to did not discuss Tammy B's narcolepsy but was actually an EEG measuring seizure activity. [Filing No. 23 at 15.]

The Court need not resolve these issues because it finds that the issue discussed above is dispositive. However, the Court notes that when dismissing Dr. Cushing's treating records – which detail treatment for conditions other than narcolepsy and hyper-somnia -- the ALJ found that the records were indicative of "consistent" but "conservative" treatment. [Filing No. 21-2 at 17.] The ALJ further observed that "objective testing such as magnetic resonance imaging ["(MRI)"] and EEG have been [*sic*] showed mild findings, at best." [Filing No. 21-2 at 17.] However, neither the MRI nor the EEG was related to Tammy B.'s narcolepsy or hyper-somnia. [*See* Filing No. 21-

8 at 277-290 (noting Tammy B.'s complaints of "headaches and tremors").] The inference that Tammy B.'s treatment was conservative and that the MRI and EEG results demonstrated "mild findings, at best" appears to be the ALJ's own inference and does not justify the ALJ's failure to fully consider Dr. Cushing's opinions regarding Tammy B.'s narcolepsy and hyper-somnia.

On remand, the Court cautions the ALJ against impermissibly playing doctor and interpreting medical evidence when he is not qualified to do so. *See Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007); *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir.1990) ("Common sense can mislead; lay intuitions about medical phenomena are often wrong.").

## IV. CONCLUSION

For the reasons detailed herein, the Court **REVERSES** the ALJ's decision denying Tammy B.'s benefits and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C.§ 405(g) (sentence 4) as detailed above. Final judgment shall issue accordingly.

Date: 3/11/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**